## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **DIEDRE BUSH AND RAQUEL DIAZ on behalf of a class of all others similarly situated,** | **Case No.** 5:21-cv-390 (LEK/ML) |
| **PLAINTIFFS,** | **CLASS ACTION COMPLAINT** |
| **- v. -** | **JURY TRIAL DEMANDED** |
| **ANCIENT BRANDS, LLC,** | |
| **DEFENDANT.** | |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs Diedre Bush and Raquel Diaz, individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring the following Class Action Complaint against Defendant Ancient Brands, LLC ("Defendant"):

## <u>NATURE OF THE ACTION</u>

1. This is a nationwide, multistate, and California and New York consumer class action brought on behalf of consumers who purchased any of Defendant's Ancient Nutrition Bone Broth Protein products**,** including but not limited to, those in any of the following follows flavors: Vanilla, Chocolate, Pure, Turmeric, Vanilla, Coffee, Banana, or any other limited, discontinued, or seasonal flavors, and any other Ancient Nutrition Bone Broth Protein products that make a protein claim but fail to state the amount of protein as a percentage of daily value and/or as calculated by the Protein Digestibility Amino Acid Corrected Score method (the "Products").

2. Defendant misleads consumers into thinking that its Product will benefit them as a result of its advertised protein content when in fact the quality of the protein in the Product is

largely indigestible to the human body and provides little to no actual benefit to consumers. The Protein Digestibility Amino Acid Corrected Score is critically important because each gram of protein is not created equal. Two products containing similar grams of protein may have different Protein Digestibility Amino Acid Corrected Score based upon the type of protein; low quality proteins will produce a lower daily value percentage.

3.      In this case, Defendant engaged in unfair and/or deceptive business practices by intentionally misrepresenting the nature and quality of the Product on the Product label and was consequently unjustly enriched. Specifically, Defendant misleads consumers into thinking that its Product will benefit them as a result of its advertised protein content of 20 grams per serving when in fact the quality of the protein in the Product is largely indigestible to the human body and provides little to no actual benefit to consumers that expect from protein products.  If the Protein Digestibility Amino Acid Corrected Score were accurately calculated and provided to the consumer, consumers would know this.

4.      As such, Defendant makes numerous false and misleading claims and omissions on the labels of the Products. These false and misleading claims include, but are not limited to, statements relating to protein content regarding the percent of daily value, sources of the protein content, and the quality of the protein in the Products.

5.      Further, Defendant does not comply with federal and parallel state regulations regarding the testing methodology of its daily value percentage, making the Products' front of the label protein content claims false and misleading.

6.      Plaintiffs and each of the Class Members accordingly suffered an injury in fact caused by the false, fraudulent, unfair, deceptive, and misleading practices set forth herein, and seek compensatory damages and injunctive relief.

## PARTIES

7.      Plaintiff Diedre Bush is, and has been at all relevant times, a resident and citizen of New York.

8.      Plaintiff Raquel Diaz is, and has been at all relevant times, a resident and citizen of California.

9.      Defendant is a Florida Limited Liability Corporation with its principal place of business in Franklin, Tennessee. Defendant sells nutritional products under the brand "Ancient Nutrients" both direct to consumers on its website and in retail stores across the United States.

10.     Defendant designed, manufactured, warranted, advertised, and sold the Products throughout the United States, including the State of New York, and continues to do so.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which some members of the Classes are citizens of states other the state in which Defendant is incorporated and has its principal place of business. For example, Plaintiffs are citizens of California and New York and Defendant is a citizen of Florida and Tennessee.

12.     This Court has personal jurisdiction over Defendant because Defendant conducts business in New York. Defendant has marketed, distributed, and sold the Products in New York. Defendant has sufficient minimum contacts with this State, and/or sufficiently avails itself to the markets of this state through its sales and marketing within this State to render the exercise of jurisdiction by this Court permissible.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (c) because a substantial part of the events or omissions giving rise to at least one of Plaintiff's claims occurred in this District.

14.     Venue is also proper under 18 U.S.C. § 1965(a) because Defendant transacts substantial business in this District.

## GENERAL ALLEGATIONS

15.     Defendant is a "nutritional products" company that states its mission is to bring to consumers "ancient nutrients in a modern form[;]"

> Our whole food nutritional products are designed to provide Ancient Nutrients in a modern, convenient form to power the body and mind, restoring us to the health, strength and vitality of our ancestors.

https://ancientnutrition.com/about/.

16.     Defendant represents itself as being founded by a doctor, Josh Axe, who states that he "is a certified doctor of natural medicine, doctor of chiropractic and clinical nutritionist," as well as a "natural health expert," Jordan Rubin. *See* https://store.draxe.com/ pages/about.[1] The clear purpose of these representations is to imbue the Products with medical authority.

17.     Indeed, Defendant purports "to provide *best-in-class real food nutritional products with wholesome, clean ingredients*" through its "pioneering" products, including "Bone Broth Protein™," *i.e.*, the Products at issue here, which are a series of powdered bone broth to be added to hot or cold drinks and other receipts. *See* https://boards.greenhouse.io/ancientnutrition (emphasis supplied).

---

[1] Defendant's website, however, notably fails to identify any further credentials of either of the founders, including where Axe received his degrees and the nature of those degrees. Nor can Axe's credentials be found from any reasonable search through Google.

18.     Defendant advertises the Products as a "[s]uperfood protein powder packed with 20 grams of protein plus support for your gut, joint and skin health" (https://store.draxe.com/pages/bone-broth-protein) and implies that the Products contain the same quality of protein as homemade bone broth:

> For centuries, humans from all around the world consumed homemade bone broth, the result of a days' long simmering process used to unlock collagen, proline, glycine and glutamine from hunted animals. Today, most people are getting 0% of these important nutritional building blocks in their diets — and our gut lining and joints are feeling it.
>
> Now, there's an easy solution. Bone Broth Protein powder features the amino acids your body's built to use, in a convenient form that busy people adore.

*Id.*

19.     Defendant's website repeatedly touts the amount of protein in the Products:

- "Bone Broth Protein is **made without dairy and contains natural compounds shown to work with your gut, not against it.** All while supplying 20 grams of satiating protein in every scoop." https://store.draxe.com/pages/bone-broth-protein

- "Add Bone Broth Protein Into Your Favorite Recipes Whether you're in the mood for 'savory' or 'sweet,' get 20g of protein and effortlessly elevate any recipe." *Id.*



*Id.*

5

20.    Defendant also touts the quality of its protein, describing the Products as "loaded with 20 grams of highly-absorbable protein." https://www.amazon.com/Ancient-Nutrition-Protein-Powder-Servings/dp/B01DOBJ84U.

21.    Defendant's marketing clearly works. Customer reviews indicate that they buy the Products because they are supposedly a good source of protein:

- Nick B. wrote on December 29, 2020: "A very pleasant taste that hides other supplements that taste bitter, with excellent up take of protein." *See* Customer Reviews, https://store.draxe.com/pages/bone-broth-protein

- Nicole B. wrote, in part, on July 20, 2020: "I put a scoop in my weekday smoothie. Great protein and great flavor." *Id*.

- Veronica F. wrote, in part, on June 4, 2020: "This is a great product. I needed more protein in my diet and this was the perfect way to get it." *Id*.

- Sheila M. wrote, on October 11, 2019: "It helps getting protein and the taste is great." *Id*.

- Glenda J. wrote, on October 1, 2019: "I'm not sure of feeling a difference; however, I trust in the products that they are doing good in my body. Thank you Dr. Axe!" *Id*.

- Blunn Creek wrote, in part, on March 6, 2019: "I searched high and low for a protein powder which is low in sugar at the same time high in protein and tasted good." "Pros: High in protein, low in sugar, many flavors to chose from." Customer Reviews, https://www.amazon.com/Ancient-Nutrition-Protein-Powder-Servings/dp/B01DOBJ84U?ref_=ast_sto_dp

- Mary B. wrote, in part, on December 3, 2019: "It has protein I need and it's a complete protein which I like." "It's the boost of protein that works for me in the morning so the expensive is part of my food budget now." "For me stating off with 20 grams of protein in the morning has been perfect for me." *Id*.

- Joann O'Toole wrote, in part, on March 26, 2020: "I also love no matter what diet program I experiment with, this one always the ingredients that are compliant. High protein, low carb, low to no sugar, low fat, and low calorie. I don't watch fat and calorie but for those who do, it's low. This one sure is a winner which I will continue to purchase." *Id*.

- L. Maisel wrote, in part, on November 2, 2020: "I like this flavor & it is so easy to put in my coffee in the AM. I think it takes a little getting used to - just like any protein powder. I am not really a morning eater - so this is a good & easy way to boost protein for me." *Id.*

- Love wrote, in part, on February 17, 2020: "Pros- … It has a lot of protein!" *Id.*

- Denise Ferrat wrote, on August 24, 2017: "I love this protein! It's the only one that hasn't messed up my GI system. It's sourced from chicken broth. (Doesn't taste like chicken, don't worry.) It has good flavor, not cloyingly sweet like other stevia sweetened products can be, it's paleo-friendly, and has 20 grams of protein per 25 gram scoop. I like to mix mine with almond milk, a banana, I add in PB Fit powder which also helps up the protein content, and chia or ground flax seed. Overall I'm very satisfied, just wish it had slightly more protein content per scoop. I will definitely be buying more and trying out the other flavors!" *See* Customer Reviews, *Id.*

22.     As discussed in more detail below, however, Defendant misrepresents and miscalculates the amount of protein in the Products, intentionally misleading consumers to increase its sales and maximize its profits.

23.     Thus, Defendant's consumers pay more for the Products, which deliver less actual and quality protein than consumers reasonably expect to receive.

24.     Plaintiffs would not have purchased or paid more for the Products had they known or were aware that the Products were deceptively labeled.

### *Labeling Requirements And Regulations*

25.     Through the Food, Drug, and Cosmetics Act ("FDCA") (as amended by the Nutrition Labeling and Education Act), the United States Food and Drug Administration ("FDA") governs the nutritional labeling of food, including the requirement to provide information about the level of certain nutrients, including protein. *See* 21 C.F.R. §101.9(c)(7).

26.     More specifically, the nutritional label regarding protein is required to include "[a] statement of the number of grams of protein in a serving[,]" which is known as the protein content. *See id.*

27.     The protein content is generally allowed to be calculated based upon measuring the nitrogen content of food (the "nitrogen content method"):

> Protein content may be calculated on the basis of the factor of 6.25 times the nitrogen content of the food as determined by the appropriate method of analysis as given in the 'Official Methods of Analysis of the AOAC International' . . . , except when the official procedure for a specific food requires another factor.

*Id.*

28.     In certain circumstances (such as the circumstances at issue here, described in Paragraphs 36-46), however, the FDCA requires disclosure of ***protein quality***, which is determined through a more rigorous testing methodology called the Protein Digestibility Amino Acid Corrected Score ("PDCAAS") to calculate the "corrected amount of protein per serving:"

> The 'corrected amount of protein (gram) per serving' . . . is equal to the actual amount of protein (gram) per serving multiplied by the amino acid score corrected for protein digestibility. . . . The protein digestibility corrected amino acid score shall be determined by methods given in . . . 'Protein Quality Evaluation, Report of the Joint FAO/WHO Expert Consultation on Protein Quality Evaluation,' Rome, 1990, except that when official AOAC procedures described in section (c)(7) of this paragraph require a specific food factor other than 6.25, that specific factor shall be used.

21 C.F.R. §101.9(c)(7)(ii).

29.     The PDCAAS measures protein quality based on human essential amino acid requirements and our ability to digest it. The test protein is compared to a standard amino acid profile and is given a score from 0-1.0, with a score of 1.0 indicating maximum amino acid digestibility. Common protein supplements (whey, casein, and soy) all receive 1.0 scores. Meat

and soybeans (0.9), vegetables and other legumes (0.7), and whole wheat and peanuts (0.25-0.55) all provide diminished protein digestibility.

30.     Collagen, the main source of protein found in the Products, has a standard amino acid profile of 0.

31.     The PDCAAS is currently considered the most reliable score of protein quality for human nutrition and has been adopted by the Food and Agriculture Organization of the United Nations and the World Health Organization as the preferred method for the measurement of the protein value in human nutrition.[2]

32.     The PDCAAS calculation "shall be determined by the methods given in sections 5.4.1, 7.2.1, and 8.00 in 'Report of the Joint FAO/WHO Expert Consultation on Protein Quality Evaluation'." 21 C.F.R. § 101.9(c)(7)(ii).

33.     The PDCAAS method does not simply calculate protein by nitrogen but requires the manufacturer to determine the amount of *essential amino acids* contained within a product and ensures that consumers are being informed about the "quality" of the protein that a product has.

34.     Once the corrected amount of protein is calculated, it is expressed not in grams, but rather as a Percentage Daily Value ("%DV").

35.     A %DV for protein is not always required to be placed on a food label. But where, as here, a manufacturer makes a "protein content claim," not only is the %DV required, but it must be calculated using the corrected protein content. *See* 21 C.F.R. §101.9(c)(7)(i) ("A statement of the corrected amount of protein per serving, as determined in paragraph (c)(7)(ii) of this section, calculated as a percentage of the RDI or DRV for protein, as appropriate, and expressed as Percent

<hr>

[2] Pasha Gurevich, *Protein Quality-The 4 Most Important Metrics*, LABDOOR MAGAZINE (May 20, 2014), https://labdoor.com/article/protein-quality-the-4-most-important-metrics.

of Daily Value, may be placed on the label, except that such a statement *shall* be given *if* a protein

claim is made for the product") (emphasis supplied); 21 C.F.R. §101.9(c)(7)(ii).[3]

### *Defendant's False Claims of Protein Content and Daily Value Percentage of Protein*

36.    Each of the Products states the amount of protein that they contain on the front of

the label.

 

---

[3] *See also Guidance for Industry: A Food Labeling Guide (7. Nutrition Labeling; Questions G1 through P8)*, U.S. FOOD & DRUG ADMINISTRATION, http://www.fda.gov/Food/GuidanceRegulation/ GuidanceDocumentsRegulatoryInformation/LabelingNutrition/ucm064894.htm#declare.




37.     As such, each of the Products make protein claims on their labels, and therefore are required to have the %DV listed in the Supplement Facts section. *See* 21 C.F.R. §101.13(c); 21 C.F.R. §101.9(c)(7)(i).

38.     In the Supplement Facts, however, the Products do not contain a %DV for protein, let alone the corrected protein content that is required. For example, the Supplement Facts for the Pure flavor of Bone Broth Protein is as follows:

**Suggested Use:** Adults take one scoop (included) with 12 ounces of water or your favorite hot or cold recipe.

# Supplement Facts

Serving Size 1 Scoop (22.3 g)
Serving Per Container About 20

|  | Amount Per Serving | % Daily Value |
|---|---|---|
| Calories | 80 | + |
| Protein | 20 g | |
| Sodium | 170 mg | 7% |
| Potassium | 280 mg | 6% |
| Chicken Bone Broth Protein Concentrate | 22.3 g | + |

\* Percent Daily Values are based on a 2,000 calorie diet.

39.     Defendant has failed to comply with FDCA regarding the PDCAAS and determining the protein content making up the % DV. Defendant did not test for individual amino acids, and it did not use the proper factors as referred to in the FDCA. Consequently, Defendant is in violation of 21 C.F.R. § 101.9(c)(7)(ii).

40.     Collagen, one of ingredients listed under the Products' Supplement Facts section, is the main protein source in the Products and has a PDCAAS of 0. Therefore, if the protein content was stated, the %DV would be much lower than consumers expected because of the inclusion of a low-quality protein such as collagen.

41.     In other words, Defendant states on the front of the Products that the Products contain 20 grams of protein per serving, leading the reasonable consumer to expect that he or she would receive a significant percentage of his or her daily value of protein from a serving. In reality, however, he or she would receive significantly less protein than expected because of the inclusion of low-quality protein.

42.     Defendant's false, deceptive, and misleading label statements violate 21 U.S.C. § 343(a)(1), which states, "[a] food shall be deemed to be misbranded—If (1) its labeling is false or misleading in any particular[,]" and the so-called "little FDCA" statutes adopted by many states.

43.     For example, under the New York Food, Drug and Cosmetic Act, New York has expressly adopted the federal food labeling requirements and has stated "[a] food shall be deemed misbranded in accordance with the Federal Food, Drug and Cosmetic Act (21 U.S.C. §343)[.]" Public Health Law §71.05(d). Thus, a violation of federal food labeling laws is an independent violation of New York law and actionable as such.

44.     Indeed, the New York Food, Drug and Cosmetic Act incorporated the exact language of the FDCA by expressly stating, "[a] food is misbranded - (a) If its labeling is false or misleading in any particular." Public Health Law §71.05(d).

45.     Defendant's conduct is also deceptive, unfair, and unlawful in that it violates the prohibition against the sale of adulterated and misbranded products under California's Sherman Laws, which adopt the federal labeling regulations as the food labeling requirements of the state. Cal. Health & Safety Code § 110100.

46.     The introduction of misbranded food into interstate commerce is prohibited under the FDCA and all state parallel statutes cited in this Class Action Complaint.

*Plaintiffs' Purchases of The Products*

47.     Plaintiff Diedre Bush is, and at all times relevant hereto has been, a citizen of the state of New York. Plaintiff has purchased the Pure and Vanilla flavors of Defendant's Bone Broth Protein several times since 2017, including from Amazon.com and The Vitamin Shoppe.

48.     Prior to purchasing the Product, Plaintiff Bush saw the claims on the front and back of the packaging that the Product contained 20 grams of protein per serving, which claim she relied on when deciding whether to purchase the Product. Plaintiff Bush, like other members of the Classes, purchased the product with the expectation that it would supplement her diet and boost muscle gain and recovery. She believed that the Product contained 20 grams of protein per serving and would provide the %DV of protein consistent with the representation of 20 grams of protein per serving and would provide a benefit to her consistent with what consumers expect other protein powders to provide with respect to their protein claims.

49.     Based on the false and misleading protein claims, warranties, representations, advertisements, and other marketing by Defendant, Plaintiff Bush and other members of the Classes were unaware that the Product's protein was mostly indigestible and contained a negligible amount of protein for her body to use. Had Defendant disclosed the amount of %DV as required by law, Plaintiff Bush would have noticed that the Product provided a negligible amount of consumable protein and would not have purchased the Product or paid more for the product than she otherwise would have.

50.     Plaintiff Raquel Diaz is, and at all times relevant hereto has been, a citizen of the state of California. Plaintiff Diaz has purchased the Pure flavor of Defendant's Bone Broth Protein regularly from 2018 through present, including from Sprouts Farmers Market and Target.

51.     Prior to purchasing the Product, Plaintiff Diaz saw the claims on the front and back of the packaging that the Product contained 20 grams of protein per serving, which claim she relied

on when deciding whether to purchase the Product. Plaintiff Diaz, like other members of the Classes, purchased the product with the expectation that it would supplement her diet and boost muscle gain and recovery. She believed that the Product contained 20 grams of protein per serving and would provide the %DV of protein consistent with the representation of 20 grams of protein per serving and would provide a benefit to her consistent with what consumers expect other protein powders to provide with respect to their protein claims.

52.     Based on the false and misleading protein claims, warranties, representations, advertisements, and other marketing by Defendant, Plaintiff Diaz and other members of the Classes were unaware that the Product's protein was mostly indigestible and contained a negligible amount of protein for her body to use. Had Defendant disclosed the amount of %DV as required by law, Plaintiff Diaz would have noticed that the Product provided a negligible amount of consumable protein and would not have purchased the Product or paid more for the product than she otherwise would have.

53.     Defendant intended for Plaintiffs and the other members of the Classes to be misled by their statements regarding the amount of protein in the Products.

54.     As the result of Defendants' intentional, deceptive, and misleading conduct as alleged herein, Plaintiffs were injured when they paid a purchase price or a price premium for the Products that did not deliver the protein value that was promised. Plaintiffs paid the premium price on the assumption that the labeling and marketing of the Products—including their stated protein value—where accurate and true. Plaintiffs would not have paid this money had they known that the Products actually provided a negligible amount of digestible protein that would provide none of the benefits associated with other protein powders available to consumers. Damages can be calculated through expert testimony at trial. Further, should Plaintiffs encounter the Products in

the future, they could not rely on the truthfulness of the packaging, absent corrective changes to

the packaging and advertising of the Products.

## **CLASS ACTION ALLEGATIONS**

55.     Plaintiffs brings this class action lawsuit on behalf of themselves and proposed

Classes of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of

Civil Procedure.

56.     Plaintiffs seek certification of the following Classes:

> **National Class:** All persons in the United States who purchased the Products.

> **Consumer Protection Multi-State Class:** All persons in the States of California,
> Florida, Illinois, Massachusetts, Minnesota, Missouri, New Jersey, New York, and
> Washington who purchased the Products.[4]

> **California Subclass:** All persons in the State of California who purchased the
> Products.

> **New York Subclass:** All persons in the State of New York who purchased the
> Products.

57.     Members of the classes described are referred to as "Class Members" or members

of the "Classes."

58.     The following are excluded from the Classes: (1) any Judge presiding over this

action and members of his or her family; (2) Defendant, Defendant's subsidiaries, parents,

successors, predecessors, and any entity in which Defendant or its parent has a controlling interest

(as well as current or former employees, officers, and directors); (3) persons who properly execute

and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have

---

[4]  The States in the Consumer Protection Multi-State Class are limited to those States with similar consumer
protection laws under the facts of this case: California (Cal. Bus. & Prof. Code § 17200, *et seq.*); Florida
(Fla. Stat. § 501.201, *et seq.*); Illinois (815 ILCS 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A,
*et seq.*); Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*);
Missouri (Mo. Rev. Stat. 407.010, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); New York (N.Y. Gen.
Bus. Law § 349, *et seq.*); and Washington (Wash Rev. Code § 19.86.010, *et seq.*).

been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

59.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

60.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous that individual joinder of all Class Members is impracticable. On information and belief, Class Members number in the thousands to millions. The precise number or identification of members of the Classes are presently unknown to Plaintiffs but may be ascertained from Defendant's books and records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

61.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all members of the Classes, which predominate over any questions affecting individual members of the Classes. These common questions of law or fact include, but are not limited to, the following:

a) The true nature of the protein content in the Products;

b) Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive and conform with the requirements of the FDCA;

c) Whether Defendant's actions violate the consumer protection statutes invoked herein;

d) Whether Defendant breached an express warranty to Plaintiffs and Class Members; and

17

e) Whether Defendant was unjustly enriched at the expense of the Plaintiffs and Class Members.

62.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and the other Class Members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

63.     **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the other Class Members because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendant in violation of law as complained of herein. Further, the damages of each Class Member were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

64.     **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate representatives of the Classes because they are members of the Classes and their interests do not conflict with the interests of the Class Members they seek to represent. Plaintiffs have also retained counsel competent and experienced in complex commercial and class action litigation. Plaintiffs and their counsel intend to prosecute this action vigorously for the benefit of all Class Members. Accordingly, the interests of the Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

65.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the Class Members are relatively small compared to the burden and expense that would be required to individually litigate their

claims against Defendant, so it would be impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS ALLEGED

### COUNT I
### Violation of State Consumer Protection Statutes
### (On Behalf of the Consumer Protection Statutes of Multi-State Class)

66.     Plaintiffs repeat and re-allege the allegations above as if set forth herein.

67.     The Consumer Protection Acts of the States in the Consumer Protection Multi-State Class prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

68.     Defendant intended that Plaintiffs and each of the other members of the Consumer Protection Multi-State Class would rely upon their deceptive conduct, and a reasonable person would in fact be misled by its deceptive conduct.

69.     As a result of the Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiffs, and each of the other members of the Consumer Protection Multi-State Class, have sustained damages in an amount to be proven at trial.

70.     In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

### COUNT II
### Violation of New York General Business Laws §§ 349 & 350
### (In The Alternative To Count I And On Behalf Of Plaintiff Bush And The New York Subclass)

71.     Plaintiffs repeat and re-allege the allegations above as if set forth herein.

72.     New York General Business Law §349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service[.]"

73.     Similarly, New York General Business Law §350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service[.]"

74.     Defendant intended that Plaintiff Bush and each of the other members of the New York Subclass would rely upon their deceptive conduct and false advertising, and a reasonable person would in fact be misled by this deceptive conduct.

75.     As a result of the Defendant's use or employment of unfair or deceptive acts or business practices and false advertising, Plaintiff Bush and each of the other members of the New York Subclass have sustained damages in an amount to be proven at trial.

76.     In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

### COUNT III
### Violation of California's Unfair Competition Law ("UCL")
### California Business and Professions Code §17200, *et seq.*
### (In The Alternative To Count I And On Behalf Of Plaintiff DIAZ And The California Subclass)

77.     Plaintiffs repeat and re-allege the allegations above as if set forth herein.

78.     The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

### The "Unfair" Prong

79.     A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

80.     Defendant's actions constitute "unfair" business practices because, as alleged above, Defendant engaged in misleading and deceptive advertising and labeling that represented misrepresented the amount of protein in the Products. Defendant's acts and practices offend an established public policy of accurate labeling, and is immoral, unethical, oppressive, and substantially injurious to consumers.

81.     The harm to Plaintiff Diaz and the California Subclass outweighs the utility of Defendant's practices. There were reasonably available alternatives to further Defendant's legitimate business interests other than the misleading and deceptive conduct described herein.

### The "Fraudulent" Prong

82.     A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

83.     Defendant's acts and practices alleged above constitute fraudulent business acts or practices as they have deceived Plaintiff Diaz is highly likely to deceive members of the consuming public. Defendant intended that Plaintiff Diaz and each of the other members of the California Subclass would rely upon their deceptive conduct and false advertising, and a reasonable person would in fact be misled by this deceptive conduct.

*The "Unlawful" Prong*

84.     A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

85.     Defendant's acts and practices alleged above constitute unlawful business acts or practices as they have violated state and federal law. Defendant's false, deceptive, and misleading label statements violate 21 U.S.C. § 343(a)(1), which states, "[a] food shall be deemed to be misbranded—If (1) its labeling is false or misleading in any particular[.]"

86.     In addition, California law expressly prohibits false advertising. *See* Cal. Bus. & Prof. Code 17500. Moreover, the Consumer Legal Remedies Act, Cal. Civ. Code § 1770(a)(9), ("CLRA") also prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised[.]"

87.     The violation of any law constitutes an "unlawful" business practice under the UCL.

88.     As detailed herein, the acts and practices alleged were intended to or did result in violations of the FTCA, the FAL, and the CLRA.

89.     Defendant's practices, as set forth above, have misled Plaintiff Diaz, the California Subclass, and the public in the past and will continue to mislead in the future. Consequently, Defendant's practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

90.     Defendant's violation of the UCL, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Plaintiff Diaz and the members of the California Subclass and the public will be deceived into purchasing products based on misrepresentations and suffer economic damages to be proven at trial.

91.     Pursuant to the UCL, Plaintiff Diaz and the California Subclass are entitled to preliminary and permanent injunctive relief and order Defendant to cease this unfair competition, as well as disgorgement and restitution to Plaintiff Diaz and the California Subclass of all Defendant's revenues associated with its unfair competition, or such portion of those revenues as the Court may find equitable.

**COUNT IV**
**Violation of California's Consumer Legal Remedies Act ("CLRA")**
**California Civil Code §1750, *et seq.***
**(In The Alternative To Count I And On Behalf Of Plaintiff Diaz And The California Subclass)**

92.     Plaintiffs repeat and re-allege the allegations above as if set forth herein.

93.     This cause of action is brought pursuant to the CLRA, Cal. Civ. Code § 1750, *et seq*. Plaintiff Diaz and the California Subclass are "consumers" as defined by Cal. Civ. Code § 1761(d). Defendant's sale of the Products in retail stores and on its website to Plaintiff Diaz and the California Subclass were "transactions" within the meaning of Cal. Civ. Code §1761(e). The Products are "goods" within the meaning of Cal. Civ. Code § 1761(a).

94.     Defendant violated and continues to violate the CLRA by engaging in at least the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions with Plaintiffs Diaz and the California Subclass that were intended to result in, and did result in, the sale of the Products:

    a.  "Advertising goods or services with intent not to sell them as advertised" (Cal. Civ. Code § 1770(a)(9));

    b.  Representing that the Products "have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have" (Cal. Civ. Code § 1770(a)(5));

    c.  Representing that the Products "are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" (Cal. Civ. Code § 1770(a)(7)).

95.     If Defendant fails to respond to the aforementioned letter, fails to agree to rectify the problems associated with the actions detailed above, or fails to give notice to all affected consumers within 30 days of the date of written notice, as proscribed by Section 1782, Plaintiff Diaz will move to amend the Complaint to pursue claims for actual, punitive, and statutory damages, as appropriate against Defendant. As to this cause of action, at this time, Plaintiff Diaz and the California Subclass seek only injunctive relief.

**COUNT V**
**Violation of California's False Advertising Law ("FAL")**
**California Business & Professions Code §17500, *et seq.***
**(In The Alternative To Count I And On Behalf Of Plaintiff Diaz And The California Subclass)**

96.     Plaintiffs repeat and re-allege the allegations above as if set forth herein.

97.     Cal. Bus. & Prof. Code § 17500 provides:

> It is unlawful for any…corporation…with intent…to dispose of…personal property…to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated…from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement…which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading…

98.     The "intent" required by Section17500 is the intent to dispose of property, and not the intent to mislead the public in the disposition of such property.

99.     Defendant's advertising and labeling that represented misrepresented the amount of protein in the Products was an unfair, untrue, and misleading practice. This deceptive marketing practice gave consumers the false impression of the amount of protein in the Products.

100.     As a direct and proximate result of Defendant's misleading and false advertisements, Plaintiff Diaz and the California Subclass have suffered injury in fact and have lost money. As such, Plaintiff requests that this Court order Defendant to restore this money to

Plaintiffs Diaz and all members of the California Subclass, and to enjoin Defendant from continuing these unfair practices in violation of the FAL in the future. Otherwise, Plaintiff, the California Subclass, and the broader public will be irreparably harmed and/or denied an effective and complete remedy.

### COUNT VI
### Breach of Express Warranty
### (On Behalf of the National Class and,
### alternatively, the California and New York Subclasses)

101.    Plaintiffs repeat and re-allege the allegations above as if set forth herein.

102.    Plaintiffs, and each member of the National Class, formed a contract with Defendant at the time Plaintiffs and each member of the National Class purchased the Products.

103.    The terms of the contract include the promises and affirmations of fact made by Defendant on the Products' packaging and through marketing and advertising, as described above.

104.    This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiffs and the members of the National Class and Defendant.

105.    As set forth above, Defendant purports, through its protein claims made in connection with its advertising, labeling, marketing, and packaging, to create an express warranty that the Products contain a certain amount of protein.

106.    Plaintiffs and the members of the National Class performed all conditions precedent to Defendant's liability under this contract when they purchased the Products.

107.    Defendant breached express warranties about the Products and their qualities because Defendant's statement about the Products were misleading, as set forth above, and the Products do not conform to Defendant's affirmations and promises described above.

108.    Plaintiffs and each of the members of the National Class would not have purchased the Products had they known the true nature of the Products' ingredients and what the Products contained.

109.    On March 22, 2021, Plaintiffs notified Defendant in writing by certified mail of the particular breaches of warranty and demanded that it rectify the problems associated with the actions detailed above.

110.    As a result of Defendant's breach of warranty, Plaintiffs and each of the members of the National Class have been damaged in the amount of the purchase price of the Products and any consequential damages resulting from their purchases.

**COUNT VII**
**Fraudulent Concealment**
**(On Behalf of the National Class and, alternatively,**
**the California and New York Subclasses)**

111.    Plaintiffs repeat and re-allege the allegations above as if set forth herein.

112.    As set forth above, Defendant concealed from and failed to disclose to Plaintiffs and the Classes that their Products actually contained only negligible amounts of protein and that it conferred none of the benefits consumers expect from protein powders or other protein-enriched products.

113.    Defendant was under a duty to disclose to Plaintiffs and members of the Classes the true amount of protein contained in the products because they were required to do so by law and because they were in a superior position to know the actual manufacturing process of their Products and knew that Plaintiffs and the Classes could not reasonably have been expected to learn or discover that Defendant was misrepresenting its protein content and protein-related benefits on the packaging, labels, advertising, and website prior to purchasing the Products.

114.    Defendant's misrepresentations and omissions that the Products contain protein and confer related benefits that they do not are material because any reasonable consumer would have considered the amount of protein and its affects on them when purchasing protein powder or other protein-enriched products.

115.    Plaintiff and the Classes justifiably relied on the omissions of Defendant to their detriment and have suffered as a direct and proximate result of Defendant's conduct actual damages in that they have purchased Products that they would have either paid less for or would have not purchased at all had they known the Products contained less protein and did not confer the protein-related benefits they expected based on the Products' protein claim.

116.    Plaintiffs and the Classes seek actual damages, injunctive and declaratory relief, attorney fees, costs, and any other just and proper relief available under the laws.

## COUNT VIII
## Unjust Enrichment
### (In The Alternative To Count I And On Behalf of the National Class and, alternatively, the California and New York Subclasses)

117.    Plaintiffs repeat and re-allege the allegations above as if set forth herein.

118.    Plaintiffs and the other members of the National Class conferred benefits on Defendant by purchasing the Products.

119.    Defendant has been unjustly enriched in retaining the revenues derived from the purchase of the Products by Plaintiffs and the other members of the National Class.

120.    Retention of those monies under these circumstances is unjust and inequitable because Defendant's labeling of the Products was misleading to consumers, which caused injuries to Plaintiffs and the other members of the National Class because they would have not purchased the Products if the true facts would have been known.

121.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and the other members of the National Class is unjust and inequitable, Defendant must pay restitution to Plaintiffs and the other members of the National Class for their unjust enrichment, as ordered by the Court.

## JURY DEMAND

122.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class Members, pray for judgment and relief against Defendant as follows:

a)  For an order declaring: (i) this is a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the proposed Classes described herein; and (ii) appointing Plaintiffs to serve as representatives for the Classes and Plaintiffs' counsel to serve as Class Counsel;

b)  For an order enjoining Defendant from continuing to engage in the unlawful conduct set forth herein;

c)  For an order awarding restitution of the monies Defendant wrongfully acquired by its illegal and deceptive conduct;

d)  For an order requiring disgorgement of the monies Defendant wrongfully acquired by its illegal and deceptive conduct;

e)  For compensatory and punitive damages, including actual and statutory damages, arising from Defendant's wrongful conduct and illegal conduct;

f)  For an award of reasonable attorneys' fees and costs and expenses incurred in the course of prosecuting this action; and

g)  For such other and further relief as the Court deems just and proper.

Dated: April 5, 2021.                    Respectfully submitted,

                                         By:     */s/ Todd S. Garber*

                                         **FINKELSTEIN,BLANKINSHIP,FREI
                                         PEARSON & GARBER, LLP**
                                         Todd S. Garber
                                         One North Broadway, Suite 900
                                         White Plains, New York 10601
                                         Tel: (914) 298-3281
                                         Fax: (914) 824-1561
                                         tgarber@fbfglaw.com

                                         Kathleen P. Lally
                                         **CARLSON LYNCH LLP**
                                         111 W. Washington Street, Suite 1240
                                         Chicago, Illinois 60602
                                         Main:    (312) 750-1265
                                         Direct:  (872) 702-3770